UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DENNIS R. HEILMAN,<br><br>            Petitioner,<br><br>vs.<br><br>RANDY BLADES,<br><br>            Respondent. | Case No. 3:11-cv-00304-DCN<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

Petitioner Dennis Heilman is proceeding on his Amended Petition for Writ of Habeas Corpus, which is now fully briefed. Dkts. 11, 40, 41, 51. Also pending before the Court are several motions filed by the parties. The Court takes judicial notice of the records from Petitioner's state court proceedings, which have been lodged by the parties. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 (9th Cir. 2006). Having carefully reviewed the record, including the state court record, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and record and that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order.

## REVIEW OF MOTION FOR JUDICIAL CLARIFICATION

Petitioner seeks copies of Exhibit 27 (a police interview) and Exhibit 28 (an audio recording) from Respondent. Judge Edward J. Lodge earlier notified Petitioner that the Court would reconsider his request for production of the audio recording (Exhibit 28) if his Petition survived Respondent's summary dismissal motion. Dkt. 34. Judge Lodge later entered an Order granting in part and denying in part the summary dismissal motion, but he did not further address production of the exhibits. Nevertheless, Respondent voluntarily provided a copy of Exhibits 27 and 28 to Petitioner. Dkt. 44. Therefore, because the object of Petitioner's Motion for Clarification is met, the Motion is now moot.

## REVIEW OF MOTION FOR EXTENSIONS OF TIME

Pending before the Court are various requests for extensions of time for the filing of responses filed by the parties. Good cause appearing, the motions will be granted.

## BACKGROUND

Petitioner and his wife, Penny, had a 22-year-long relationship, the last 14 of which they were married. They had two children together. In this action, Petitioner was accused of breaking into their marital home where Penny resided, raping her, and holding her hostage.

During the couple's separation, Penny filed for divorce, remained in the family home with their two children, and obtained a permanent civil protection order against Petitioner. As a result, Petitioner was immediately excluded from his home and

belongings, and felt displaced, angry, and resentful. He wanted to reconcile with Penny. Because of the protection order, the couple met at a local McDonald's each week to exchange their two children for Petitioner's visitation. State's Lodging A-3, p. 664-68.

On the evening of Friday, December 16, 2005, Petitioner had the children for visitation. He left them sleeping at his mother's house, put a large amount of Keystone beer in his truck, and drove to Penny's residence. He testified that he had been drinking, felt suicidal, and took his holstered pistol with him, because, in his own words, "I guess I had it in my head that if I couldn't fix things, I didn't want to live any more." *Id.*, p. 842.

In the early morning hours of December 17, 2005, Petitioner tried to enter the residence that he and Penny once shared. Petitioner testified that he tried several keys, tried to use his garage door opener, became impatient, and used a baseball bat from the garage to break through the door. *Id.*, pp. 842-43. Penny awoke, heard Petitioner outside, and yelled for him to go away. When she saw his hand reach through the hole in the door, she picked up the phone to call 911. However, he ripped the phone from the wall before she made contact. He said to her, "Who's holding the cards now, bitch?" *Id.*, p. 843.

Penny had several variations of how she and Petitioner got from the kitchen to the bedroom. At trial, Penny testified that Petitioner unsnapped the holster to his gun, pushed her, and told her to get back to the bedroom. *Id.*, p. 675. Petitioner denied ever unholstering his gun. *Id.*, p. 844-45. He denied having threatened her with the gun that night. *Id.*, p. 846.

Penny testified at trial that Petitioner made her lie down on the floor in front of the bed and made her put her hands above her head. He said if she moved, he would kill her. She did not see him take the gun out of the holster, but surmised that he must have taken it out while he escorted her to the bedroom. He held the gun on her while she was lying on the floor, though he never touched her with it. She thought he was going to shoot here then and there. State's Lodging A-3, pp. 675-77.

Penny lay still while Petitioner left the room for a short time. Petitioner returned with a can of beer, and he allowed Penny to get up off the floor and sit on the bed. He began to ask, "How could you have done this to me?"—meaning the divorce and the restraining order. He said he wanted to come back. He was very upset over Penny's choice of a lawyer in the divorce proceedings. Penny testified that Petitioner was very emotional and angry and kept the gun beside him the entire time. *Id*., pp. 678-81.

Petitioner, on the other hand, testified on direct examination that he and Penny went to the bedroom and sat on the bed and talked about some of their problems. *Id*., pp. 843-44. He wanted to go out to get some beer out of his truck, and so he "asked her to lay down on the floor." *Id*., at 844. He says the gun was never removed from the holster. *Id*. at 845.

When Penny told Petitioner that she didn't want to reconcile, he made her lie on the bed face down with her hands above her head. He pointed the gun at her and said if she moved, he would kill her. *Id*., p. 681. He again left the room for a short time and came back with a shot gun and ammunition. *Id*., p. 682-83. She could not think of a way

to escape quickly enough because of the layout of the house and decided that it was better just to lie there. *Id*. When Petitioner sat down on the bed and began to load the shotgun, he allowed Penny to sit up on the bed. *Id.* In contrast, Petitioner testified during cross-examination that he asked her to stay lying on the bed, and that she was face down on her stomach, but no threat was made. State's Lodging A-3, p. 88.

Between 1:00 a.m. and 3:00 a.m., Petitioner discussed the same topics repeatedly with Penny—talking about how that the demise of their marriage was his fault, changing his position to discuss how it was Penny's fault, and reminiscing about good times they had had together. She tried to calm him by reminding him to think about their "two wonderful children" and encouraging him to look forward, not back in his life. *Id*., p. 685.

Petitioner took off all his clothes except his underwear and t-shirt. He decided he wanted to cuddle with Penny, and she complied to keep him calm. He dozed off between 3:00 and 6:00 a.m., but she was unable to escape because he was not sound asleep, and every time she moved, he gripped her tighter. Petitioner disagreed with Penny's perception that she was not free to leave.

During the entire ordeal, Petitioner drank the Keystone beer that he had brought with him. He had also brought two bags of marijuana. Penny declined to smoke it, but Petitioner pointed the gun at her and said, "Do it." She said she "faked like [she] was

doing it, but not." *Id*., pp. 691-92. Petitioner contrarily testified that she smoked with him voluntarily. *Id*., p. 846.[1]

At approximately 6:00 a.m., Petitioner woke up and Penny told him he should go back to the children he left sleeping at his mother's house. He refused, because nothing had been solved, and he wanted an assurance from her that he could come back. *Id*., p. 849. He resumed drinking. He told her he wanted to have sex with her, and she said no. He then pushed her down and pulled down her sweatpants, at which point he realized she was menstruating. He straddled her and told her to perform oral sex, and she said, "Please stop, please stop, no." He took off his underwear and rubbed his penis on her face. State's Lodging A-3, pp. 694-95.

He next reached inside her sweatshirt, grabbed her nipples, and began to twist them. She screamed in pain, and he told her to shut up.[2] He covered her mouth with one hand and her nose with the other for a few seconds, causing her to be unable to breathe. *Id*., p. 696.

---

[1] During their relationship, the couple regularly smoked marijuana together. In 2004 or 2005, the couple separated. Petitioner testified that he continued to regularly smoke marijuana after the separation. Penny testified that she considered herself a recreational user of marijuana, but that she hadn't smoked it since "a little before the separation," and that she hadn't smoked "very much for the last year or so." *Id*. at 755. Usually Petitioner had supplied their marijuana, but years ago Penny sometimes had supplied it for their use. *Id*. at 757.
    Leroy Michael Kuykendall, a friend of the couple since 1987, testified that he saw Penny smoke marijuana socially more than 100 times in all the years he had known them. When Petitioner's attorney asked, "So, you would describe that she probably smoked marijuana pretty regularly socially when you went out?" *Id*. at 792. Mr. Kuykendall answered, "Occasionally anyway, yeah. I – I don't know how regular or anything. I'd just – yeah." *Id*.

[2] The parties testified that during their marriage, when they had sexual relations, Petitioner would twist Penny's nipples. Petitioner testified this was simply part of their "normal sex life." State's Lodging A-3, p. 850. Penny testified that, while Petitioner often twisted her nipples, he did it simply to be "mean." *Id*., p. 753. She elaborated: "He would always—he was constantly throughout—anytime always coming and grabbing and twisting, and how I hated it. But it was a control thing." *Id*.

Petitioner next tried to engage in anal sex but was unsuccessful in penetrating her because she resisted by screaming and squeezing her buttocks together. She was "moving all the time trying to get him off [her]." *Id*., p. 697. He then turned her over and proceeded to rape her. She begged him to stop. She lay supine with her legs down. He asked her to put her legs up so he could enjoy it more, but she refused. He twisted her nipples again very hard. *Id*., pp. 698-701.

Petitioner testified on direct examination that he started out asking her for oral sex, but she was not interested. He then said he twisted her nipples like he normally did during sex, and then they had sex, without a struggle, without Penny ever saying no. *Id*., 850-51. On cross-examination, Petitioner said he didn't remember straddling Penny's chest, but that it was "possible." *Id*., p. 877. He said he didn't recall whether she was crying during intercourse, but said it was "possible." *Id*., p. 879. He said Penny really didn't want to have sex with him, but that he didn't force her to. *Id*., pp. 879-80.

Penny remained unable to escape. When Petitioner's mother woke up and couldn't find Petitioner at home, she called Petitioner's brother's girlfriend, Ruby, to see if she had seen him. *Id*., p. 475. Ruby located Petitioner's truck at Penny's residence. *Id*., p. 476.

At about 9:00 a.m., Penny heard banging on the door, but Petitioner would not let her answer. Penny's perception was that Petitioner did not want her to answer the phone, and so she made no attempt to answer. They could hear Penny's sister Ruby leaving message after message, with a final message that if they didn't pick up, she would send

the police over. State's Lodging A-3, pp. 882-84. They also heard Petitioner's father call and leave a message saying, "Don't do anything stupid." *Id.*, p. 886. Petitioner testified that he didn't pick up the telephone calls but Penny was free to pick them up if she wanted to. *Id.*, pp. 702, 887. Petitioner moved Penny and his weapons into the basement of the house, where there were additional weapons that he loaded. *Id.*, pp. 702-723.

At about 10:30 a.m., Petitioner and Penny heard police officers enter the home and go upstairs. Petitioner yelled to the officers, "Get the fuck out of my house." *Id.*, p. 454. The officers left. Over the next several hours, Petitioner was engaged in a stand-off with police officers, moving Penny back and forth between the basement and the bedroom. During that time, Petitioner also asked Penny about their wills, specifically, "who got the children when we were gone." *Id.*, p. 701. Penny convinced Petitioner not to kill himself during the standoff. *Id.*, p. 766. He had gone so far as to put the gun to his head. *Id.*, p. 767.

Petitioner's theory on the charges was that he had momentarily mentally snapped and was suicidal, but that he had no intention of hurting Penny, only reconciling with her. His position was that the sexual intercourse was consensual, and that she was free to leave at any time during his visit.

However, on cross-examination, Petitioner testified otherwise in response to the prosecutor's questions:

> Q.    When you heard the SWAT team come in upstairs,
>        you didn't let Penny go out and say it's okay, you
>        don't need to hurt anyone, correct?
>
> A.    Correct.
>
> Q.    She wasn't free to leave, isn't that true?
>
> A.    I never told her she couldn't leave.
>
> Q.    Was she free to leave?
>
> A.    She wasn't free to leave; you had not resolved your
>        issues?
>
> A.    Correct.

State's Lodging A-3, p. 895.

Finally, about 4:00 p.m., a police SWAT team entered the house and ordered

Petitioner to put up his hands, because he was sitting amongst several firearms. He would

not, and so an officer kicked him in the chest. *Id*., pp. 554-55. Penny was able to escape

at that time with the officers' help. Petitioner was taken into custody. *Id*., pp. 702-723;

899-96.

Petitioner was charged with rape, aggravated assault, second-degree kidnaping,

burglary, and a sentencing enhancement for use of a deadly weapon in commission of the

crimes. State's Lodgings A-1, pp. 21-24; A-4. Petitioner was represented at trial by

attorney Richard Cuddihy. The lead prosecutor was Sandra Dickerson. Petitioner

proceeded to trial. The jury convicted him of rape, aggravated assault, false imprisonment

and unlawful entry (lesser included offenses of kidnaping and burglary). State's Lodging

A-1, pp. 111-115. The state district court sentenced Petitioner to six fixed years of

imprisonment on the rape and aggravated assault charges, with fourteen years indeterminate, and to concurrent shorter sentences for the lesser included offenses. State's Lodgings A-1, pp. 166-170; A-3, pp. 1078-1079; A-4.

After proceeding through direct appeal and post-conviction proceedings in state court, Petitioner filed this federal habeas corpus action. Earlier in this matter, the Court dismissed several of Petitioner's claims with prejudice on procedural grounds. Dkt. 37. The Court permitted Petitioner to proceed to the merits of Claims One, Two, Four(b), Five(b), Seven, Eight, Nine, Ten, Eleven, and Thirteen through Fifteen. Thereafter, in his Answer and Brief in Support of Dismissal, Respondent raised an additional procedural defense to these claims. Dkt. 40. The Court first addresses the procedural defense.

## PROCEDURAL DEFAULT DEFENSES

Previously in granting in part Respondent's Motion for Partial Summary Dismissal, the Court determined that Claims Four(a), Five(a), and Six were procedurally defaulted. The Court permitted Petitioner to show that adequate excuse for the default in this round of litigation.

In his Answer and Brief in Support of Dismissal of Petition (Dkt. 40), Respondent newly asserts that Petitioner's remaining ineffective assistance of counsel claims—Four(b), Five(b), Seven, Eight, Nine and Eleven—are also procedurally defaulted for the following reasons. Petitioner presented his ineffective assistance of trial counsel claims to the state district court in his *successive* post-conviction petition. After "a hearing on the state's motion [for summary dismissal], the district court summarily dismissed Heilman's

successive petition, concluding that his claims either did not justify relief as a matter of law or were not supported by evidence raising a genuine issue of material fact." State's Lodging G-4 p. 2. On appeal of the dismissal, the Idaho Court of Appeals concluded that Petitioner did not meet the procedural requirements set forth in Idaho Code §19-4908 for bringing ineffective assistance of trial counsel claims in a successive petition, because Petitioner attempted to raise them in a successive post-conviction petition. The Idaho Court of Appeals agreed with the state district court that the claims should have been brought in the original petition and no adequate excuse existed for the failure to bring them. *See* State's Lodging G-4.

As a threshold matter, This Court first concludes that raising this procedural defense in the Answer is procedurally appropriate, because the Order to Re-Open Case specified that procedural defenses could be raised either in a pre-answer motion or in the answer, in the alternative to a merits argument on the claims. (Dkt. 13, p. 9). There is no legal or equitable reason that Respondent cannot raise some of the procedural issues earlier and others later, so long as Petitioner has an opportunity to reply, as here.

"To qualify as an adequate procedural ground, a state rule must be firmly established and regularly followed." *Walker v. Martin*, 562 U.S. 307, 316 (2011) (internal quotation marks omitted). That is, the state procedural bar must be one that is "'clear, consistently applied, and well-established at the time of the petitioner's purported default." *Martinez v. Klauser*, 266 F.3d 1091, 1093-94 (9th Cir. 2001) (quoting *Wells v. Maass*, 28 F.3d 1005, 1010 (9th Cir. 1994)). A state procedural bar can be considered

adequate even if it is a discretionary rule, even though "the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Beard v. Kindler*, 558 U.S. 53, 61 (2009). A state rule's "use of an imprecise standard . . . is no justification for depriving a rule's language of any meaning." *Walker*, 562 U.S. at 318 (internal quotation marks and alteration omitted).

A state procedural bar is "independent" of federal law if it does not rest on, and if it is not interwoven with, federal grounds. *Bennett v. Mueller*, 322 F.3d 573, 581 (9th Cir. 2003). A rule will not be deemed independent of federal law "if the state has made application of the procedural bar depend on an antecedent ruling on federal law such as the determination of whether federal constitutional error has been committed." *Id*. (internal quotation marks and alteration omitted); *see also Ake v. Oklahoma*, 470 U.S. 68, 75 (1985) (stating that "when resolution of the state procedural law question depends on a federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law, and our jurisdiction is not precluded," and holding that a state waiver rule was not independent because, "[b]efore applying the waiver doctrine to a constitutional question, the state court must rule, either explicitly or implicitly, on the merits of the constitutional question").

In Petitioner's case, the state procedural bar is grounded in state statute:

> All grounds for relief available to an applicant under this act must be raised in his original, supplemental or amended application. Any ground finally adjudicated or not so raised, or knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the applicant has taken to secure relief

> may not be the basis for a subsequent application, *unless the court finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the original, supplemental, or amended application*.

Idaho Code § 19-4908 (emphasis added).

Petitioner laid blame for the default of his ineffective assistance of trial counsel claims at the feet of his original post-conviction counsel. Petitioner failed to assert any other excuse for the failure to raise his other claims. *See* State's Lodging G-4.

Since 2014, the Idaho Supreme Court has changed direction and interpreted I.C. § 19-4908 as *not* permitting the assertion of ineffective assistance of post-conviction counsel as an adequate excuse for omitting claims from an original post-conviction petition. *Murphy v. State*, 327 P.3d 365 (Idaho 2014) (interpreting Idaho Code § 19-4908). Since that date, that rule of interpretation has been consistently applied in Idaho. As of the date Petitioner attempted to raise ineffective assistance of post-conviction counsel as grounds for permitting him to file a successive state post-conviction matter, that rule of interpretation was well-established. This Court knows of no pattern of deviations from this rule that would cause it to question its consistent application since 2014. It is a rule that is not intertwined with federal law, and therefore it is an independent procedural bar.

As to the other new ineffective assistance of trial counsel claims that Petitioner tried to bring without asserting any excuse for their default, the Court concludes they are barred by the plain language of I.C. §19-4908, above. This statutory bar predates *Murphy*

and has been well-established and consistently applied by the Idaho courts. It is a bar that has nothing to do with federal law.

Accordingly, the Court concludes that the following additional claims are procedurally barred: Claims Four(b), Five(b), Seven Eight, Nine, and Eleven. However, rather than permitting Petitioner additional opportunity to brief whether there exists an adequate excuse for the default of these claims, the Court will consider the merits of the claims themselves, as if they are not procedurally defaulted.

## DE NOVO MERITS REVIEW
## OF DEFAULTED CLAIMS

### 1. Standard of Law

When a federal claim reaches federal habeas corpus review, if the highest state appellate court did not decide the merits of the claim, then the more deferential habeas corpus standard of § 2254(d)(1) (discussed further below) does not apply, and the federal district court reviews the claim de novo. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

Under de novo review, if the factual findings of the state court are not unreasonable, the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Id.* at 1167. Contrarily, if a state court factual determination is unreasonable, or if there are no state court factual findings, the federal court is not limited by § 2254(e)(1), the federal district court may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply.

*Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014); *Maxwell v. Roe*, 628 F.3d 486, 495-96 (9th Cir. 2010).

**2. Ineffective Assistance of Counsel Claims**

**A. Standard of Law**

The clearly-established law governing a claim of ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984). There, the United States Supreme Court determined that, to succeed on an ineffective assistance claim, a petitioner must show that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness, and that (2) the petitioner was prejudiced by the deficient performance. *Id*. at 684.

In assessing whether trial counsel's representation fell below an objective standard of competence under *Strickland*'s first prong, a reviewing court must view counsel's conduct at the time that the challenged act or omission occurred, making an effort to eliminate the distorting lens of hindsight. *Id*. at 689. The court must indulge in the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id*.

Prejudice under these circumstances means there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id*. at 684, 694. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id*. at 694.

A petitioner must establish both incompetence and prejudice to prove an ineffective assistance of counsel case. 466 U.S. at 697. On habeas review, the court may consider either prong of the *Strickland* test first, or it may address both prongs, even if one is deficient and will compel denial. *Id.*

### B.    Claims Four(a) and Four(b)

Petitioner articulated Claims Four(a) and (b) as follows: "Prosecutor misconduct: Sandra Dickerson's redefinition of rape in closing argument. Mr. Cuddihy ineffective/ incompetent for failure to object to redefinition?" Dkt. 11, p. 8 (verbatim).

This issue surrounds the language of the Information charging that Petitioner "did penetrate the vaginal opening of [Penny], a female person, with his penis, and where [Penny] resisted, but her resistance was overcome by force and violence in that Defendant forced himself on her *even when she attempted to physically fight him away*." State's Lodging E-3, pp. 6-7 (emphasis added). Petitioner argues that the evidence did not show that Penny tried to physically fight him away during sexual intercourse, and the prosecutor improperly tried to de-emphasize that lack of physical fighting evidence by emphasizing mere lack of consent during intercourse. Dkt. 49, p. 15.

Petitioner particularly takes issues with these prosecutor's statement during closing argument: "Ladies and gentlemen, it was rape. He had a gun right there. It was rape." State's Lodging A-3, p. 991. Petitioner also objects to the prosecutor's statements that "[h]e knew she didn't want sex. He forced her to have sex. That's rape. I don't care if he was her estranged husband. She didn't want it." *Id.*, p. 1029.

Petitioner's argument might be viable had the prosecutor stopped there and sat down. These statements were *not* in the context of the prosecutor detailing each and every element of the crime for the jury, so the jury could not have been misled in that respect. In addition, throughout the prosecutor's closing argument, she reviewed the evidence that she believed met the elements of the crime of rape *and* she directed the jurors' attention to Instruction 11, which set forth all the elements of rape, including *attempting to physically fight him away*. The prosecutor explained the State's theory of the case, highlighted some of the facts, and argued that Petitioner's conduct met the elements set forth in Instruction 11.

The prosecutor did *not* disregard the jury instructions or attempt to interpret them for the jury in an unnatural or unusual way—she simply spoke of theory, evidence, and instructions and directed the jurors to follow the relevant instruction number. The prosecutor had the difficult task of creating a closing argument that covered four different charges. She chose not to do that charge by charge and element by element, but instead wove together the points she felt necessary into a closing argument that followed a chronological pattern.

Elsewhere in her closing, the prosecutor included this comprehensive argument:

> Instruction No. 11, again, this is for rape, and there is no – no dispute over the date of where it happened. And in this case, even though we're not going to check this right now, there is no dispute at all that the defendant, Dennis Heilman, caused his penis to penetrate, however, slightly, the vaginal opening of Penny Heilman. Dennis admitted that they had sex. So, there's really no dispute over that either, but we'll come back to the other.

State's Lodging A-3, p. 990. The prosecutor further reviewed trial testimony relevant to

the rape charge in this manner:

> Question, she – and then when we're talking about the rape, he says first he asked for oral sex. Penny told you that, too. He denied ever asking or forcing any type of anal sex, but then he said he wanted vaginal sex. And he said he had vaginal sex with her. And when I asked him: Question: She didn't really want to have sex with you, did she?
>
> Answer: No.
>
> I said, so you forced her?
>
> Well, no.
>
> But she didn't want to have sex?
>
> Well, no.
>
> She didn't, so it was non-consensual.
>
> Ladies and gentlemen, it was rape. He had a gun right there. It was rape. She told you how he twisted her nipples and she cried out. He admitted that she cried. He tried to tell you that was part of their normal sex life. She cried out. Her nipples were hurting. Her nipples were swollen. He had sex with her.
>
> Then he told you that he stopped having sex with her because all of a sudden he realized that she was on her female time of the month. You're not required, when you come and sit on jury duty, to leave your common sense or your life experience on the courthouse door. I submit to you, if that makes sense to you [sic].

State's Lodging A-3, pp. 990-91. The prosecutor was implying that Petitioner finally

stopped trying because Penny did not willingly participate or resisted, not because she

was on her menstrual cycle, because that had been evident from her soiled hygiene pad when he pulled down her underwear.

Moreover, later in her closing argument, the prosecutor said:

> Instruction No. 11, let's go back. In order for the defendant to be guilty of rape, as charged, the State must prove each of the following. We've already done one and two. We all agree, there's no dispute there.

> On No.3, Mr. Heilman admits to having sex. The evidence that you have of the fact that it was forced is the testimony you heard from Mrs. Heilman and the testimony that you've heard from the defendant. Compare them. Which makes sense? I'd submit to you that the State has proven beyond a reasonable doubt each and every element of rape.

*Id.*, pp. 992-93.

Having reviewed the entirety of the prosecutor's closing argument, the Court concludes that Petitioner's claim is completely without merit. There was no incorrect definition of "rape" suggested by the prosecutor because throughout her closing argument she referred jurors to Instruction 11, which contained all of the elements of the crime of rape. That she highlighted some of the elements, such as that it was against her will, was necessary, because that rebutted Petitioner's specific theory of defense—that the sex had been consensual. There is no requirement that she highlight every element. If the prosecution stands silent on any element of the charged crime, it is to their *disadvantage*, not their advantage, because jurors are instructed that *every* element must be met to convict.

Petitioner's trial counsel was not ineffective for failing to object to the closing argument, because the objection likely would have served only to prompt the prosecutor to spend the next part of her argument highlighting which facts constituted Penny's *physical fighting him away* during the continuous course of him trying to satisfy himself by some type of sex with Penny—she struggled when he had his hand over her mouth, she tried to push him off, she squeezed her buttocks together to avoid anal penetration, and she tried to keep her legs down during intercourse. In the overall context of the incident, the jury certainly could have found (and obviously did find) that these efforts were enough to constitute "physical fighting." Petitioner's attempt to narrowly define "physically fighting him away" under the facts laid before the jury is unreasonable.

Based on the overall circumstances, the Court concludes that an objection was not necessary and would not have been fruitful in the context of the closing argument. Jurors are assumed to follow the jury instructions. *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). Counsel reasonably could have concluded, as a tactical matter, that interrupting the prosecutor's closing argument with objections could harm Petitioner's case, by highlighting negative points or simply by irritating jurors. *See Clabourne v. Lewis*, 64 F.3d 1373, 1383 (9th Cir.1995) (failure to object to prosecutor's references to petitioner's competency to stand trial was not ineffective—"competent counsel might have many valid reasons for failing ... to interrupt opposing counsel during opening and closing statements").

Because Petitioner's trial counsel was not ineffective, Petitioner's post-conviction counsel, in turn, was not ineffective for winnowing these claims out of the petition. These claims are denied on the merits on de novo review.

### 3. Claim Five(a) and Five(b)

Claim Five(a) is that trial counsel was ineffective for failing to impeach the victim's trial testimony that she had not used marijuana in months. Claim Five(b) is that counsel was ineffective for failing to retain an expert witness to challenge this testimony. Penny testified at trial that Petitioner forced her to smoke marijuana with him on the night in question, and so she tried to pretend she was smoking it. She testified that she did not smoke enough to feel any effects from the marijuana or to impact her recollection of the incident, but that there could have been some marijuana in her system. State's Lodging A-3, p. 755.

Petitioner's trial counsel asked Officer Larry Stuck to verify that Penny's toxicology report indicated a positive result for cannabis, with a level of "99 nanograms." Petitioner's counsel then asked Officer Stuck: "So the base level that they can observe it according to that test is .15 nanograms; that 50 nanograms is considered positive; and that the result of this test is 99, correct?" Officer Stuck then verified that the form indicated that result, but he did not know how the tests were done. *Id.*, p. 824. On cross-examination, the prosecutor asked the officer if he knew the significance of the 99 nanograms, or whether it was high or low. Officer Stuck said he did not. *Id.*, pp. 826-27.

Petitioner's counsel argued in his closing argument that Penny had not testified truthfully that she had abstained from use of marijuana since the separation one year

earlier. *Id.*, pp. 1004-005. Petitioner's counsel then argued: "Her testimony is contradictory. And, if you can't believe her about smoking marijuana, then can you believe her when he tells you that Dennis put a gun to her head and forced her to smoke marijuana? I submit to you, that's reasonable doubt." State's Lodging A-3, p. 1005.

Petitioner wanted his counsel to prove that Penny had been smoking marijuana throughout their separation, and *that* is why she had the 99 nanograms of marijuana in her system. However, Petitioner has failed to show that the defense team could have retained an expert who would have opined that the 99 nanograms was from Penny's repeated usage throughout the separation, rather than from the incident that evening, when Penny asserted that Petitioner forced her to smoke marijuana, and she tried to fake it. At trial she readily admitted that she *could* have ingested some that night. Without knowing what an expert would say about this particular set of circumstances, there is no way to tell whether this would have been a productive avenue without expert testimony or authoritative information. All that is known is that an expert could have opined in a helpful or a harmful way—which does not support an ineffective assistance claim.

The Court also considers whether Petitioner's counsel had a clear strategy for impeachment. The record shows that counsel did pursue a particular strategy. He pointed out example after example of variations between what Penny reported to officers on the day of the incident and what she said at trial. *Id.*, pp. 733-46. Importantly, Petitioner's counsel highlighted the fact that she had not told the officers that Petitioner held a drawn

gun on her in any of the three incidents she reported—a very critical detail she left out at a time when the incident would have been fresh in her mind. *Id*.

The Court also concludes that Petitioner's counsel's strategy was effective without the need for the marijuana expert, and that there is not a reasonable probability that, but for counsel's failure to hire an expert, the result of the proceeding would have been different. *Id*. at 684, 694. Had Petitioner's counsel hired a marijuana expert, the State likely would have done the same. Had the State received an expert report stating that the test results were incompatible with Penny's assertion that she had not used marijuana during the separation, the prosecution may have informed Penny, and Penny may have decided instead to tell the truth to avoid any cross-examination problems. In any event, to a reasonable law-abiding juror, the fact that both Penny and Petitioner admitted to using marijuana throughout most of their marriage likely would have greatly reduced the impeachment value of Penny's recent marijuana use, because both parties' credibility was already damaged by their admissions of breaking the law in that manner.

Therefore, the marijuana angle presented minimal potential impeachment value. Penny's failure to mention the gun to the police, on the other hand, was relevant and went directly to the elements of some of the charged crimes. The strength of that argument is obviously the reason counsel chose that defense strategy.

The Court has engaged in this exercise of possibilities to show that counsel's decisions cannot be judged in hindsight, under the *Strickland* standard. 466 U.S. at 689.

The Court must indulge in the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id*. Here, it most certainly did.

Trial strategy is like a chess game. For every step in one direction the defense takes, the prosecution will do its best to head off victory—by employing its own marijuana expert or taking a different angle with witnesses. As Petitioner learned with the late disclosure of his psychological expert, it is not possible under the Rules of Evidence to surprise the prosecution with an expert at trial. Petitioner's counsel's strategy regarding the marijuana was wise, reasonable, and cost-effective. Counsel directed the jury's attention to the fact that the amount in Penny's system was twice that of a minimum positive level, and he used the marijuana information to Petitioner's advantage, suggesting that Penny generally lied about other important facts. Because Petitioner has not shown either deficient performance or prejudice, this claim fails de novo review on the merits.

### 4. Claim Six

Claim Six is that trial counsel was ineffective for failing to ensure that Petitioner received a speedy trial. (Dkt. 11, p. 10.) Respondent contends that Petitioner raised similar, but not the same, claims in the appeal of his post-conviction matter—arguing that his *appellate* and *post-conviction* counsel were ineffective for failing to bring the speedy trial issue. (*See* State's Exhibits G-1, G-3.) The Idaho Court of Appeals addressed and rejected the claim as an ineffective assistance of appellate counsel claim. (State's Lodging G-4, pp. 4,7.) The Court agrees that the claim that *trial* counsel was ineffective for failing to raise the speedy trial issue was never raised

before the Idaho appellate courts, and hence it is procedurally defaulted. In addition, to the extent that Petitioner is also raising a stand-alone speedy trial claim (unclear from the Amended Petition) based on the right to a fair trial, due process, and judicial bias, such a claim is also procedurally defaulted. (Dkt. 11, p. 10.)

On appeal of dismissal of Petitioner's successive post-conviction petition, the Idaho Court of Appeals addressed the fact that Petitioner provided no facts or legal argument showing that the speedy trial claim was a viable claim that should have been raised in the initial post-conviction proceedings:

> Heilman has failed to raise a genuine issue of material fact for any of his claims of ineffective assistance of appellate counsel [including the speedy trial issue]. These claims in Heilman's successive petition are conclusory and fail to allege facts that, if true, would entitle Heilman to relief as a matter of law. Moreover, Heilman fails to support any of these allegations with admissible evidence.

State's Lodging G-4, p. 7.

In his federal Petition, Petitioner includes the argument that "where the accused is incarcerated within state and his whereabouts are known to prosecuting authorities, time within which he is to be secured in his right to speedy trial is to be computed from date original complaint against him. However, he provides no computation here, just as he neglected to do in the Idaho Court of Appeals action.

The federal right to a speedy trial is not as narrowly-defined as the state right to a speedy trial. In *State v. Davis*, 118 P.3d 160 (Ct. App. 2005), the Idaho Court of Appeals

explained the difference between state-law speedy trial rights and federal constitutional speedy trial rights:

> The constitutional right to a speedy trial is a fundamental right. *State v. Avelar,* 129 Idaho 700, 703, 931 P.2d 1218, 1221 (1997). [Idaho Code] Section 19–3501 expands that right in three circumstances and provides a speedy trial guarantee above and beyond that provided by the state and federal constitutions. *Id.* As a [state] statutory expansion of a fundamental constitutional right, the statutory right to a speedy trial is not fundamental. *Id.*

*Id.*, p. 174 (parentheticals added).

In contrast to the state statute's more particular terms that define a state-law speedy trial claim, in *Barker v. Wingo*, 407 U.S. 514 (1972), the United States Supreme Court addressed application of the speedy trial right guaranteed by the Sixth Amendment and chose a flexible approach for assessing whether a speedy trial has been unconstitutionally denied. The Court adopted a balancing test that considers the conduct of the defendant and the prosecution, particularly focusing on four factors to be weighed in determining whether a defendant has been deprived of his Sixth Amendment speedy trial right: (1) the length of the delay; (2) the reason for the delay; (3) whether the defendant asserted the right to a speedy trial; and (4) the prejudice to the defendant. *Id*. at 530.

Petitioner makes no attempt in his reply brief to show how his federal speedy trial rights were violated. Dkt. 49, pp. 21-22. The Court is not required to search through the record on its own to discover the factual basis of Petitioner's claim, but, nevertheless, it has done so.

In Idaho, the presumptive speedy trial time frame Petitioner asserts applies to him is six months from Information to trial. I.C. § 19-3501(2). The original criminal Complaint against Petitioner was filed on December 19, 2005. State's Lodging A-1, p. 10. On December 28, 2005, Petitioner requested a continuance of the preliminary hearing. State's Lodging A-1, p. 18. Petitioner was bound over for trial on January 5, 2006, the same day the original Information was filed. An amended information was filed on April 25, 2006. *Id*., p. 35. Jury trial was set for May 1, 2006.

At the final pretrial conference on April 27, 2006, the state district court continued the trial to June 26, 2006, notwithstanding the fact that both sides wanted to go forward to trial on May 1, 2006. *Id*., p. 50. The case was continued because the prosecution had filed a motion in limine to preclude the trial testimony of Petitioner's mental health expert, Dr. Reznicek, given Petitioner's late disclosure of his information to the prosecution. The Court reasoned:

> Mr. Cuddihy indicated that you (Petitioner) weren't by any means wanting this vacated or moved. And Ms. Dickerson indicated that on – from her end of things, people that are interested in this trial don't want this moved. And I want to tell you that I appreciate that concern, but I also think it's important that I do this correctly. And this is something that's kind of come up here at the last minute, and I want to sort it out and make sure I do it correctly, at least I'm confident that I'm applying the law correctly.

State's Lodging A-3, pp. 31.

Petitioner did not make any argument in the Idaho Court of Appeals showing that the *Barker* factors weigh in his favor, nor does he here. While the state court indicated in

its reasoning cited directly above that it was aware Petitioner wanted to proceed to trial in May, Petitioner does not state that he urged his counsel to object when the court indicated that it was continuing the trial to June to take more time to consider the prosecution's motion in limine to exclude Petitioner's expert witness. Therefore, he did not particularly indicate to the state court that his right to a speedy trial was more important than additional time for consideration of his expert witness issue.

The continuance of the trial was prompted by Petitioner's late disclosure of his expert, which then led to a prosecution motion in limine to exclude the expert testimony, which then led to the court deciding that it was better for it to take more time to research and consider the issue, rather than make an immediate decision simply to keep the trial within six months. The delay in holding trial was minimal—less than two months. Petitioner was not prejudiced by the delay, but, rather, aided by it, because the court invested substantial time and effort in the question and eventually denied the prosecution's motion in limine and allowed Petitioner's late-disclosed expert to testify. State's Lodging A-3, pp. 62-68.

Petitioner has failed to show that his trial counsel was ineffective for failing to pursue a speedy trial issue. Therefore, the claim also fails de novo review.

5. **Claim Seven**

Claim Seven is that Petitioner's counsel was ineffective for failing to adequately cross-examine the victim regarding her interview with Officer Stuck. Petitioner also includes "Failure to impeach!" in his claim—with no explanation of whether this refers to

impeachment of Penny regarding her police interview, or impeachment of Penny in general.

Petitioner has failed to pinpoint any particular areas where counsel was deficient. As this Court mentioned directly above, Petitioner's counsel performed a thorough and aggressive cross-examination of the key contradictions between Penny's trial testimony and her interview the day of the incident. His re-cross-examination highlighted the three times she failed to mention that Petitioner held a gun to her in her same-day interview with the police. State's Lodging A-3, p. 775. Yet, counsel was not so aggressive as to cause the opposite effect and have the jury begin to feel sympathy for the victim. *See* State's Lodging A-3, pp. 729-77.

Respondent is correct that the *Strickland* standard "does not require perfect trial performance," but "only competence." Dkt. 40, p. 36, citing *Sherron v. Norris*, 69 F.3d 285, 290 (11th Cir. 1995). The Court sees no deficiency in counsel's cross-examination performance—especially given the difficulty he faced. Counsel had to walk a tightrope calmly and methodically, with the allegedly consensual sexual encounter precariously positioned in the middle of the facts that Petitioner broke through the door with the baseball bat at the beginning of the incident and required SWAT team intervention at the end. Or, a view of only the sexual incidents shows that counsel had to try to prove that the allegedly consensual vaginal penetration occurred after Petitioner unsuccessfully tried to penetrate Penny's mouth and anus with his penis in the midst of screaming and struggling. Petitioner has suggested no viable alternatives for cross-examination fodder

that would have been more effective than what counsel chose. This claim fails to warrant relief on de novo review.

In his Reply, Petitioner attempts to expand the "Failure to impeach!" claim to cover several items not included in his petition. For example, Petitioner wanted his counsel to pursue a line of questioning to prove that Penny simply fabricated the rape charges to gain an advantage in their divorce. This might have been a viable theory had Petitioner not broken into the home by smashing in the door with a baseball bat or had he decided to allow Penny to leave before, or even shortly after, the SWAT team arrived. Clearly, those events were *not* inventions of Penny, and to suggest that the crime occurring in the middle of those uncontested events was a fabrication would be very difficult for any reasonable juror to believe. This claim is frivolous and subject to denial on de novo review.

### 6. Claim Eight

Claim Eight is that trial counsel was ineffective for failing to request that the jury be instructed on several lesser-included offenses of aggravated assault—misdemeanor exhibition of a deadly weapon, I.C. § 18-3304, and misdemeanor aiming or pointing a firearm at another person without malice, I.C. § 18-3304.

These claims are frivolous. The first requires that the perpetrator display the weapon in the presence of two or more people. To argue that Petitioner counted as one of the persons required by the statute would have damaged the credibility of trial counsel and would have been rejected out of hand by any reasonable juror.

It seems that Petitioner's theory for requesting the second instruction is that he should be excused for pointing a gun at Penny because his only intent in doing so was to discuss the protective order and reconciliation until it was resolved, not to harm her. However, Petitioner's uncontested opening line—"Who's holding the cards now, bitch?"—and the other testimony at trial establishing that he wanted to secure a promise from Penny to allow him to return and Penny did not want to reconcile with him— provides no basis for this instruction. Nowhere in modern society is it acceptable to hold someone at gunpoint to discuss family law issues until they relinquish their point of view. This claim, as well, is frivolous.

Overall, trial counsel had a tremendously difficult task with facts that weighed heavily against Petitioner. Nonetheless, with counsel's help, Petitioner was *not* convicted of the four charged felonies, but only two felonies. The jury found him not guilty of second degree kidnaping or burglary, but only of misdemeanor false imprisonment and unlawful entry. State's Lodging A-3, pp. 1033-34. Trial counsel was not deficient in the chosen defense strategy, including his handling of the jury instructions, or the manner in which he executed the defense strategy.

### 7. Claim Nine

Claim Nine is that counsel failed to request that the jury be instructed on the spousal rape exception set forth in I.C. § 18-6107. That section provides: "No person shall be convicted of rape for any act or acts with that person's spouse, except under the circumstances cited in subsections (4), (5), (6) and (10) of section 18-6101, Idaho Code." Subsection (4) is the section under which Petitioner was charged—"[w]here the victim

resists but the resistance is overcome by force or violence." I.C. § 18-6101. There is

nothing in the record that points to the sexual intercourse as "consensual"; therefore, it is

clear that this instruction was unnecessary. Counsel was not deficient in failing to suggest

it as a jury instruction and Petitioner was not prejudiced by the omission. This claim fails

on de novo review.

### 8. Claim Eleven

Claim Eleven is that trial counsel was ineffective for failing to argue that a photo

of the holstered gun admitted into evidence was inconsistent with testimony from the

victim (1) that the gun was pointed at her rather than in a holster, and (2) that Petitioner

was wearing his underwear, not the belt to which the holster was attached. This claim is

also frivolous. Obviously, Petitioner could have pulled his gun out of the holster to hold

Penny at bay in the bedroom and then returned the gun to the holster. Petitioner did not

necessarily need the pistol later in the ordeal because he had a stockpile of loaded guns

around him when the SWAT team stormed the basement.

## DEFERENTIAL MERTIS REVIEW OF PROPERLY-EXHAUSTED CLAIMS

### 1. Standard of Law

Federal habeas corpus relief may be granted where a petitioner "is in custody in

violation of the Constitution or laws or treaties of the United States." 28 U.S.C.

§ 2254(a). Where the petitioner challenges a state court judgment in which the

petitioner's federal claims were adjudicated on the merits, then Title 28 U.S.C.§ 2254(d),

as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

applies. Title 28 U.S.C.§ 2254(d) limits relief to instances where the state court's

adjudication of the petitioner's claim:

1. resulted in a decision that was contrary to, or involved an unreasonable
   application of, clearly established Federal law, as determined by the
   Supreme Court of the United States; or

2. resulted in a decision that was based on an unreasonable determination of
   the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). A federal habeas court reviews the state court's "last reasoned

decision" in determining whether a petitioner is entitled to relief. *Ylst v. Nunnemaker*, 501

U.S. 797, 804 (1991).

Where a petitioner contests the state court's legal conclusions, including

application of the law to the facts, § 2254(d)(1) governs. That section consists of two

alternative tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established

federal law "if the state court applies a rule different from the governing law set forth in

[the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court]

[has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694

(2002).

Under the second test, to satisfy the "unreasonable application" clause of

§ 2254(d)(1) the petitioner must show that the state court—although it identified "the

correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably

applie[d] it to the facts of the particular state prisoner's case." *Williams (Terry) v. Taylor*,

529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which

a state court unreasonably *applies* [Supreme Court] precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 572 U.S 415, 426 (2014).

A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's decision is incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell*, 535 U.S. at 694. If fairminded jurists could disagree on the correctness of the state court's decision, then relief is not warranted under § 2254(d)(1). *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The Supreme Court emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (internal citation omitted).

Though the source of clearly established federal law must come only from the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999). However, circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

## 2. Ineffective Assistance of Appellate Counsel Claims: Thirteen, Fourteen, and Fifteen

### A. Standard of Law

The *Strickland* principles cited above apply to determining ineffective assistance of appellate counsel claims. *Evitts v. Lucey*, 469 U.S. 387 (1985). To show prejudice on appeal, a petitioner must show that his attorney failed to raise an issue obvious from the trial record that probably would have resulted in reversal. *See Miller v. Keeney*, 882 F.2d 1428, 1434 n.9 (9th Cir. 1989). If a petitioner does not show that an attorney's act or omission would have resulted in reversal, then he cannot satisfy either prong of *Strickland*: appellate counsel was not ineffective for failing to raise such an issue, and petitioner suffered no prejudice as a result of it not having been raised. *See Miller*, 882 F.2d at 1435.

"Effective legal assistance" does not mean that appellate counsel must appeal every question of law or every nonfrivolous issue requested by a criminal defendant. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). "[N]othing in the Constitution" requires "judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable claim' suggested by a client." *Id*. at 754. "[T]he process of winnowing out weaker claims on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Burger v. Kemp*, 483 U.S. 776, 784 (1987) (internal citations and punctuation omitted).

However, on federal habeas corpus review, not only is deference given to counsel's decisionmaking, another layer of deference—to the state court decision—is afforded under AEDPA. In giving guidance to district courts reviewing *Strickland* claims on habeas corpus review, the United States Supreme Court explained:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard.... Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, *supra*, at 410, 120 S.Ct. 1495. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Richter*, 562 U.S. at 101.

### B. State Appellate Court Opinion

The Idaho Court of Appeals determined the following as to all of Petitioner's ineffective assistance of appellate counsel claims:

> Heilman has failed to raise a genuine issue of material fact for any of his claims of ineffective assistance of appellate counsel. These claims in Heilman's successive petition are conclusory and fail to allege facts, that, if true, would entitle Heilman to relief as a matter of law. Moreover, Heilman fails to support any of these allegations with admissible evidence.
>
> Specifically, Heilman does not explain why his appointed appellate counsel's failure to raise the issues he alleges constituted objectively deficient performance or how he was prejudiced thereby. An indigent defendant does not have a constitutional right to compel appointed counsel to press all nonfrivolous arguments that the defendant wishes to pursue.

State's Lodging G-4, p. 7. This decision is entitled to AEDPA deference.

### C.  Claim Thirteen

Petitioner alleges that his appellate counsel was ineffective for failing to appeal the trial court's decision to sustain an objection to testimony regarding a pending divorce action between Petitioner and Penny, in which Penny allegedly changed her stated reason for the divorce from "irreconcilable differences" to "abuse." Dkt. 11, p. 19. As noted above, Petitioner wanted to assert that Penny fabricated the rape charge to gain an unfair advantage in the divorce to obtain more property and full custody of the children. Given the facts of the unlawful entry into the house and the requirement of the SWAT team to convince Petitioner to leave his weapons and come out of the house, the state court acted well within its discretion to refuse to permit Petitioner to delve into Penny's motivation for changing the reasons for seeking divorce.

Petitioner has not shown that this claim had any potential merit. The lack of merit is the reason appellate counsel selected other claims for appeal. The Idaho Court of Appeals' decision was not an unreasonable application of *Strickland*, and no relief is warranted in this matter under the doubly-deferential standard of § 2254.

### D.  Claim Fifteen(a): Denial of Motion to Subpoena a Juror and Claim Fifteen(b): Denial of  Motion for a New Trial

Petitioner alleges that appellate counsel should have appealed the district court's denial of Petitioner's motion to subpoena a juror. During jury deliberations, the jury tried to play the recording of Penny's initial statement made to police. The jurors were not able

to get the equipment to work, and so they asked the bailiff for help. The bailiff asked a Nez Perce County computer specialist to check the equipment. Apparently, a password was needed. Afterward, the jury was able to listen to the recorded statement. State's Lodging A-2, p. 205.

Petitioner was not informed of this anomaly at the time it occurred, but only learned of it by chance after the trial. *Id.*, pp. 205-06. Petitioner moved the trial court for a new trial, asserting that juror misconduct had occurred. He also moved the court to subpoena a juror to a hearing after trial to expound on the incident. *Id.*

The state district court denied the motion to subpoena a juror, because "[i]n order to determine the [e]ffect of not hearing the audio recording immediately, the juror would have to provide information concerning their mental processes and how the delay of hearing the audio recording affected this process," and that "information is clearly precluded under I.R.E. 606(b)." *Id.*, p. 219. The court denied the motion for a new trial, because Petitioner did not establish that jury misconduct occurred; this scenario was very much unlike a situation where the jury asks for clarification of a jury instruction or the law. Further, the court concluded: "Nothing in this record supports that prejudice reasonably could have occurred because the jury was unable to immediately access the audio recording," but instead accessed it a short time later, after technical help. *Id.*, pp. 220-22.

Petitioner argues that appellate counsel should have appealed the district court's denial of his motion for a new trial. However, it is apparent from the record and the trial

court's careful analysis of this issue that it would not have been a prevailing argument on appeal. A short delay in listening to the audio recording, after obtaining technical help from the bailiff and a county computer specialist, did not amount to misconduct, nor did it prejudice Petitioner's case. The prohibition on encroaching into the mental processes of the jury is strictly upheld by courts of appeal, and, especially in the insignificant instance of equipment failure, it was not necessary to subpoena a juror as a prerequisite to decide the new trial issue.

Therefore, Petitioner has not shown that this claim would have been a better choice on appeal than the issues that were selected by counsel. The Idaho Court of Appeals' opinion rejecting this claim is a reasonable application of *Strickland*, foreclosing federal habeas corpus relief.

### E.  Claim Fifteen(c): Trial Court's Limitation on Presentation of Evidence regarding the Victim's Employment Background on Cross-examination

Petitioner asserts that at the time of the incident, Penny was employed at the Rogers Counseling Center/Community Sexual Assault Program as a bookkeeper. Petitioner's vague argument is that, "[a]lthough she was a bookkeeper, she spoke with counselors on a daily basis." Dkt. 11, p. 19. The trial court, however, refused to allow Petitioner's counsel opportunity to cross-examine Penny on her employment background.

This subject matter was raised by another witness. On cross-examination of Officer Stuck, the prosecutor elicited that Penny had "refuse[d] [an] advocate from [the] YWCA." The prosecutor then brought out the fact that Penny worked for Rogers

Counseling, which "provides counseling services for victims of assault." State's Lodging A-5, p. 827.

Petitioner provides no argument specifically addressing these claims in his Reply to Respondent's Answer and Brief in Support of Dismissal. Dkt. 4-, pp. 29-30. He simply concludes: "Appellate counsel was ineffective for failing to include essential claims that were needed to demonstrate the true motivations for Mrs. Heilman to capitalize on an isolated mental health break-down, to dispense of her husband with a false accusation of rape." *Id*.

Petitioner fails to realize that his side of the story—that there was never any abuse or nonconsensual sex between them—and Penny's side of the story—that Petitioner physically abused her during sex as a means of control throughout their marriage and raped her that night—were laid before the jury for it to determine who was more credible. More peripheral evidence—like Penny's access to sexual abuse counselors—weighing in on the question of whether the sexual intercourse was consensual sex or rape would have been inconsequential. Penny needed no help from her counselors to concoct facts to support a false rape claim, because (1) Petitioner supplied sufficient facts through his own testimony suggesting that the sexual intercourse was not consensual and (2) the break-in and SWAT team visit clearly showed Penny's lack of consent to the whole course of events that evening. Penny testified sufficiently that she did what she could to physically resist any type of sexual contact, including intercourse.

The Idaho Court of Appeals' *Strickland* analysis is sound. Petitioner has not shown that this issue had merit and should have been selected for appeal. Nothing about this claim in the context of the entire trial transcript raises a question about the effectiveness of Petitioner's appellate counsel. Accordingly, Petitioner is not entitled to habeas corpus relief.

### 3. Claim Fourteen: Ineffective Assistance for Failing to File an Appellate Reply Brief

Petitioner asserts that his direct appeal counsel was ineffective for failing to file a reply brief or request oral argument in the direct appeal matter. In Idaho, reply briefs and oral arguments are optional. Petitioner has not pointed to any particular harm that came from the failure to file a reply brief or request oral argument. The Court finds none in its review of the case, and there is no novel or close issue that needed to be highlighted. Therefore, Petitioner has failed to show either deficient performance or prejudice. The Idaho Court of Appeals' decision rejecting this claim was not an unreasonable application of *Strickland* and other Supreme Court case law governing appellate counsel performance. The claim will be denied on the merits.

### 4. Claims One and Ten: Fatal Variance

#### A. Standard of Law

The Sixth Amendment, which is applicable to the states through the Due Process Clause of the Fourteenth Amendment, guarantees a criminal defendant the fundamental right to be clearly informed of the nature and cause of the charges against him. *See* U.S. Const. amend. VI; *Jackson v. Virginia*, 443 U.S. 307, 314 (1979) ("It is axiomatic that a

conviction upon a charge not made or upon a charge not tried constitutes a denial of due

process."). In *Berger v. United States*, 295 U.S. 78 (1935), the Court explained:

> The true inquiry ... is not whether there has been a variance
> in proof, but whether there has been such a variance as to
> "affect the substantial rights" of the accused. The general rule
> that allegations and proof must correspond is based upon the
> obvious requirements (1) that the accused shall be definitely
> informed as to the charges against him so that he may be
> enabled to present his defense and not be taken by surprise by
> the evidence offered at the trial; and (2) that he may be
> protected against another prosecution for the offense.

*Id*. at 82. The United States Supreme Court has not otherwise elaborated on the law

governing fatal variances. *See Haines v. Risley*, 412 F.3d 285, 291 (1st Cir. 2005) ("Save

at either end of the spectrum, it is far from clear what distinguishes a permissible variance

(as between facts charged and facts proved) from an impermissible constructive

amendment.").

## B.    *Claim One: Aggravated Assault*

Claim One challenges the aggravated assault conviction. Petitioner alleges that

there existed a fatal variance between (a) the charging information and evidence adduced

at trial; and (b) the information and the jury instructions. He alleges violations of his due

process rights under the Sixth and Fourteenth Amendments and argues that the variance

left him open to the risk of double jeopardy and producing a less-than-unanimous verdict.

The aggravated assault charge in the Information specified that Petitioner "did

intentionally, unlawfully, and with apparent ability threaten by word and/or act to do

violence upon the person of [P.H.], with a deadly weapon to wit: *by forcing her into her*

*bedroom*, holding her against her will and threatening to kill her, while in possession of a pistol which created a well-founded fear in [P.H.] that such violence was imminent." *See* State's Lodging E-3 (emphasis added). Penny testified that Petitioner made her lie down in the bedroom *twice* under threat of being killed. Petitioner argues that he could be charged again for one of incidents, violating the double jeopardy rule.

The Idaho Court of Appeals determined that there was no fatal variance because of the phrase *forced her into the bedroom*. Penny testified that Petitioner forced her into the bedroom initially, but not a second time (because she was already there). Therefore, the charging instrument refers to the initial incident only. State's Lodging E-3, pp. 5-6. The Idaho Court of Appeals also concluded that the jury instruction for aggravated assault "mirrored" the charging Information by repeating the phrase *forced her into the bedroom*. Id., p. 5.

This Court rejects Petitioner's argument that, because the prosecutor mentioned the victim's testimony of being forced to lie on the floor "on two separate occasions," *see* State's Lodging A-3, p. 993, there was a fatal variance—and that he somehow was being charged with two instances of aggravated assault or could have been charged again later for the same assault. Directly before the prosecutor made this statement, she said, "Instruction No. 14 is the aggravated assault. Pay particular attention to No. 4, *by forcing her into the bedroom*, holding her against her will and threatening to kill her in the possession of a pistol." *Id.*, pp. 993 (emphasis added). The closing argument tracked the Information and the jury instruction in a plain and understandable manner, and, thus,

Petitioner had been on notice from the Information about how to defend against the charge, regardless of the mention of the second incident in the closing argument.

Petitioner has not shown that the Idaho Court of Appeals' decision rejecting the fatal variance argument regarding the aggravated assault charge and the evidence adduced at trial is contrary to, or an unreasonable application, of the United States Supreme Court precedent explaining the import of the fatal variance rule. Petitioner clearly could not be charged again for forcing the victim into the bedroom based on the testimony at trial, because the victim testified that act occurred only once. Petitioner was clearly informed of the charge in the Information. The jury instruction clarified that "being forced into the bedroom" was an essential finding for a guilty verdict. Claims One(a) and (b) will be denied on the merits.

### C.   *Claim Ten: Rape*

Claim Ten is that there existed a fatal variance among the charging information, jury instructions, and evidence adduced at trial with respect to the rape conviction. Idaho Code § 18-6101 defines rape, in pertinent part, as "[w]here the victim resists but the resistance is overcome by force *or* violence." *Id*. (emphasis added). The Information charged that Petitioner "did penetrate the vaginal opening of [P.H.], a female person, with his penis, and where [P.H.] resisted, but her resistance was overcome by force *and* violence in that Defendant forced himself on her even when she attempted to physically fight him away." State's Lodging E-3, pp. 6-7 (emphasis added.)

The jury instruction provided that the State must prove that Petitioner "caused his penis to penetrate, however slightly, the vaginal opening of [P.H.], a female person; and [P.H.] resisted but her resistance was overcome by force or violence." The companion jury instruction provided: "Although [P.H.] must have resisted the act of penetration, the amount of resistance need only be such as would show the victim's lack of consent to the act." *Id.*, p. 7.

The Idaho Court of Appeals determined that no fatal variance occurred. The difference between "or" and "and" was a minor variance and did not cause Petitioner to be misled in the preparation of his defense because Petitioner's defense was that the victim consented, and so there was no confusion on his part over whether he had to prove force *or* violence or force *and* violence. Neither was any part of Petitioner's defense focused on the amount of resistance put forth by the victim—rather, he argued that she consented to sexual intercourse. *Id.*, pp. 7-8.

The reasoning of the Idaho Court of Appeals makes abundant sense in the context of the trial record. Petitioner garnered all the facts to show that he had not used force *or* violence or force *and* violence, but felt like he had obtained Penny's consent to have vaginal sexual intercourse that night.

Further, the Court rejects Petitioner's argument that there was not enough evidence at trial to suggest that Penny physically resisted vaginal intercourse, as charged in the Information. Penny testified that, when Petitioner entered her vaginally, she was "asking him, begging to have him stop." State's Lodging A-3, p. 698. She physically

resisted by keeping her legs down and refusing to her legs up to participate willingly in the sexual activity when he asked her to. *Id*. He "twisted her nipples really hard" when she refused to comply. *Id*. Petitioner had the gun on the bed next to her while he penetrated her. *Id*., pp. 698-99.

Further, in the continuous course of sexual abuse that took place before he attempted to vaginally rape her, she had tried to push him off when he straddled her and put his penis on her face. *Id*., p. 695. She screamed when he twisted her nipples. *Id*., p. 696. When he tried to anally rape her, she used what she described as "[f]orce of cheeks" to stop him—she "clamp[ed] her buttocks together "tight" and "scream[ed], you know, trying to say stop it, no." *Id*., p. 697. There is nothing in the record suggesting that, as soon as Petitioner suggested vaginal sex, Penny consented—in fact, Petitioner, himself testified on cross-examination that she did not want to have sex. *Id*., pp. 879-80. Rather, the entire course of sexual abuse demonstrates that Penny resisted physically and verbally, to no avail, and Petitioner physically forced himself on her in every way he knew how, including by violence when he tried to suffocate her and when he brandished a firearm. The broader context of the whole incident also suggests force and violence: Petitioner began his visit by breaking Penny's door with a baseball bat, armed with a gun, and the visit was ended involuntarily by SWAT team. The Court rejects Petitioner's argument that his rape conviction should be overturned because the victim should have fought him off more during vaginal rape after his forced unsuccessful attempts at oral sex and anal sex, in which she exerted physical resistance.

Petitioner has not shown that the conclusion of the Idaho Court of Appeals on this fatal variance issue is contrary to, or an unreasonable application of federal law. The opinion is reasonable and grounded in the facts in the record. Habeas relief is not warranted.

## CONCLUSION

Some of Petitioner's claims are procedurally defaulted, and, even if they were not, they fail on a de novo merits review. Some of the claims are frivolous. Based on the entirety of the record and the same facts and discussion set forth above, the Court also concludes that Petitioner has not met the *Schlup* standard for a showing of actual innocence.

As for the remainder of his properly-exhausted claims, the Court concludes that Petitioner has not met the high threshold of 28 U.S.C. § 2254 to warrant relief. Therefore, the Amended Petition, and this entire action, will be dismissed with prejudice.

## ORDER

**IT IS ORDERED:**

1. Petitioner's Motion for Judicial Clarification (Dkt. 41) is MOOT.

2. Respondent's Motion for Extension of Time to File Answer (Dkt. 38) is GRANTED.

3. Petitioner's Motions for Extension of Time to File Traverse/Reply (Dkt. 45, 47) are GRANTED.

4. Respondent's Motion for Extension of Time to File Sur-reply (Dkt. 50) is GRANTED.

5. The Answer, Reply, and Sur-reply are deemed timely.

6. Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 11) and this entire action are DISMISSED with prejudice.

7. The Court does not find its resolution of this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. If Petitioner files a timely notice of appeal, the Clerk of Court shall forward a copy of the notice of appeal, together with this Order, to the United States Court of Appeals for the Ninth Circuit. Petitioner may seek a certificate of appealability from the Ninth Circuit by filing a request in that court.

DATED: October 19, 2018

David C. Nye
U.S. District Court Judge